IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| STEVEN K. BAUGHMAN, #02180609 | § | |
| VS. | § | CIVIL ACTION NO. 6:20cv560 |
| JIMMY BOWMAN, ET AL. | § | |

<u>INITIAL REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Steven Kurt Baughman, a prisoner confined at the Powledge Unit within the Texas

Department of Criminal Justice (TDCJ), proceeding *pro se* and *in forma pauperis*, filed this civil

rights lawsuit complaining of alleged violations of his constitutional rights occurring at the

Powledge Unit. The case was referred to the undersigned United States Magistrate Judge for

findings of fact, conclusions of law, and recommendations for the disposition of the case.

Baughman is suing (1) Jimmy Bowman, Warden, (2) Vernon Mitchell, Assistant Warden,

(3) Bryan Collier, Executive Director of TDCJ, (4) Lorie Davis, former Director, (5) Texas Board

of Criminal Justice (TBCJ), (6) TDCJ, (7) Krystal Poe, Officer, (8) Betty Reeves, Officer, (9)

Yolanda Ellis, Officer, (10) Karen Clakley, Officer, (11) Ronnie Stanhope, Lieutenant, and (12)

Melissa Ballard, RN.

The present Report concerns only Baughman's medical deliberate indifference, property,

and retaliation claims[1]. For reasons explained below, the Court recommends that those claims be

dismissed, with prejudice, for the failure to state a claim upon which relief may be granted.

---

[1] By separate order, the Court ordered Defendants TDCJ, TBCJ, Bowman, Mitchell, Collier, Davis, and Bingham to answer Baughman's amended complaint regarding his heat, ADA, and use-of-force claims, (Dkt. #63).

**II. Baughman's Amended Complaint—Operative Pleading**

The operative pleading in this lawsuit in Baughman's amended complaint, (Dkt. #13). An amended complaint entirely supersedes and takes the place of the original complaint. *See Clark v. Tarrant Cnty., Tex.*, 798 F.2d 736 (5th Cir. 1986). Baughman generalizes the factual allegations as follows:

> Plaintiff's suit arises in part from the appalling and extreme conditions that Plaintiff and similarly situated suffer each summer as a result of the extreme heat in the inmate housing areas of Powledge, and the substantial serious harm, including permanent injury and death, to which these conditions expose them. Plaintiff has no way to alleviate these conditions himself, and what little means Defendants make available to Plaintiff does little or nothing to alleviate the extreme heat conditions that Plaintiff suffers.

(Dkt. #13, pg. 11). He explains that most prisoners assigned to Powledge are minimum custody prisoners serving time for non-violent offenses. Powledge began operations in 1982 and has a maximum capacity of 1,400 prisoners. The Unit is a medical facility and houses geriatric prisoners, prisoners with disabilities, and prisoners with chronic medical problems.

a. Medical Deliberate Indifference

Baughman alleges that Defendants Poe, Reeves, Ellis, Ballard, Bowman, and Mitchell acted with deliberate indifference to his serious medical needs, specifically his cellulitis, "through denial of access to medical providers and/or through refusal to diagnose and treat Plaintiff." *Id.* at pg. 17. He explains that he is 60 years old and suffers from obesity, diabetes, hypertension, hypothyroidism, cellulitis, and chronic kidney disease.

On March 13, 2019, Baughman had an official lay-in pass—"Administrative Orders for TDCJ security to allow prisoners passage to medical"—for 8:00-8:30 am to see Dr. Charles Adams due to his cellulitis requiring treatment. He states in his complaint that cellulitis "constitutes a serious medical need and requires prompt treatment and denial of prompt treatment in diabetics can cause decompensation of the tissue, sepsis, and gangrene, and amputation of the toes, feet, and

legs. *Id*. at pg. 18. Baughman presented his lay-in pass to Defendant Poe on at 8:00 am on 15 Dorm, but Defendant Poe refused to allow Plaintiff off the dorm to access medical. Defendant [Poe] said she had called Defendant Betty Reeves, the officer working in medical and was allegedly told not to allow Plaintiff off the dorm because there was "already a wheelchair-dependent prisoner in the cage." *Id*. Baughman submitted a prison grievance about this incident, grievance number 2019093715.

Baughman maintains that Defendants Poe and Reeves act of denying him access to this medical appointment constitutes deliberate indifference to his serious medical needs. He states that he suffered from "more severe swelling" of his legs and feet. Baughman explains that he developed cellulitis again on September 14, 2019, and he presented this problem to Defendant Ballard during an evening insulin clinic. *Id*. at pg. 19. He showed her his legs and feet, which were swollen, feverish, red, and blistered; Defendant Ballard told him to submit a sick-call request. Baughman submitted a sick-call request and received a lay-in pass for a "Nurse Sick Call" on September 23, 2019, at 8:00 pm "and at that time presented the lay-in to Defendant Yolanda Ellis, Officer working on 15 dorm on that date and time." *Id*. at pg. 19.

Defendant Ellis refused to allow him off of the dorm to attend this medical appointment. Baughman states that she called the medical department and spoke with Defendant Ballard, who remarked to Defendant Ellis that she "was not running nurses sick call" and not to allow Baughman access to medical. Defendant Ballard, Baughman states, refused to see him and refer him to a provider—as she was acting as the "gate-keeper" to the medical department. *Id*.

Baughman alleges that his condition "was allowed to become worse" from September 14th through September 23rd. On the morning of September 24th, at insulin clinic, Defendant Ballard told him to submit another sick-call request but denied him a "referral to the provider" and acted

with deliberate indifference.  Ultimately, Baughman maintains that Defendants denied him access to medical and medical treatment for his cellulitis, thereby placing him at substantial risk of serious bodily harm—the possible amputation of toes, feet, and legs as well as gangrene—in violation of the Eighth Amendment. *Id*. at pg. 19-20.

B. Retaliation

Baughman further maintains that Defendants retaliated against him by filing a disciplinary case on him for engaging in speech protected by the First Amendment. He argues that he received a disciplinary case for filing a grievance against Defendant Poe after an incident that occurred on August 15, 2019.

On September 30, 2019, Baughman spoke to T. Rainy, the Powledge Unit Grievance Investigator, about "Defendant Poe's habitual wiping of her nose and the unsanitary manner in which she was handling inmates' food," (Dkt. #13, pg. 26). He also complained about her "coming out from behind the serving-line and chasing prisoners down the hall for getting extra food (i.e., a piece of bread), while yelling and screaming [insanely], and acting in a fashion that would indicate she was using drugs." *Id*.

Subsequently, on October 12, 2019, the dining hall was serving pork sloppy-joes on both serving lines. On B-line, however, Defendant Poe was also serving leftover beef-chili mac as a "serve-out," which Baughman describes as "serve till you run out," (Dkt. #13, pg. 26). The beef-chili mac was not served on A-line, which Baughman was "forced to enter" by a non-defendant. Baughman explains that he is Muslim and is forbidden to eat pork, which he alleges Defendant Poe knew.

Baughman explains that he proceeded through A-line "and got beans and other vegetables on his tray" and then proceeded to B-line with his tray and "per policy requested that Defendant

Poe give him a serving of the beef-chili-mac (leftovers/serve-out), and Defendant refused to serve Plaintiff the same food she was serving to others." *Id.* at pg. 27. At this point, Baughman approached Officer Salazar, who was working dining hall security, and requested Salazar call the Food Service Supervisor so he could speak to a supervisor. Salazar asked why he needed to speak to a supervisor, and Baughman explained that Defendant Poe was serving beef-chili-mac to others, knowing he is Muslim and cannot eat pork, but she refused to serve him the beef-chili-mac. Salazar spoke to Defendant Poe, at which point Defendant Poe "yelled at Salazar and ordered him to get his ID and write him up for being out of place." *Id.* Salazar told Baughman to eat his beans and file a grievance.

Moreover, Baughman explains that on October 14, 2019, he was called into Officer Tanner's office in regard to his letters, requests to staff, and grievances about Defendant Poe. *Id.* at pg. 27. Tanner asked him what he was "doing accusing her officer of doing drugs and mishandling food," and "you don't know her and have no right to say such things about her." *Id.* Baughman explains that he articulated what had occurred on October 12, 2019, and Tanner informed him that "there was no write-up that she knew of[,] and that Poe was on her days off," but that Tanner would speak to Defendant Poe when she came back to work on October 16, 2019. *Id.* at pg. 27.

Baughman further explains that he was served with a disciplinary case, number 2020036036, which alleged that "Offender Baughman, Steven Kurt, TDCJ-CID No. 02180609, was in B2 Dining Hall, in B-line after receiving his tray in A-line, when he in fact had no authorization to be in such place." *Id.* Defendant Stanhope conducted the disciplinary hearing on October 20, 2019, and refused Baughman to call Officer Salazar as a witness but accepted his written statement, which read as follows:

a).    The disciplinary case was issued in retaliation for Plaintiff exercising protected speech; but for plaintiff requesting to speak to a supervisor to report misconduct of Defendant Poe [which included her unsanitary handling of food being served to prisoners by her and her suspected drug use].

b).    Plaintiff was rightfully in the chow-hall; as it was meal time, and there are no written or posted rules prohibiting the actions taken by Plaintiff. Failure to promulgate and post any such rules violates due process; where prisoners are entitled to notice of all rules, policies, and regulations for which they may receive disciplinary sanctions for violating.

c).    The TDCJ-CID Inmate Orientation Handbook, section III.D.8. states, "Offenders who are not satisfied with the food may talk to the officer on duty." Which is what Plaintiff did when he requested a serving of beef-chili-mac from Defendant Poe. Thus, Plaintiff complied with TDCJ policy and but for the retaliatory motive [Plaintiff reporting Defendant Poe's drug use, unsanitary handling of inmate's food, and requesting to speak to her supervisor] Plaintiff would not have been issued a disciplinary case.

*Id*. at pg. 28. Defendant Stanhope found him guilty and assessed Baughman a punishment at 15 days of commissary restriction. After Baughman filed a disciplinary appeal, on November 13, 2019, Defendant Bowman overturned the disciplinary case and had the record of the disciplinary case expunged from his prison record. Baughman insists, however, that the damage had already been done—as he "already suffered the 15 day commissary restriction though, causing [him] irreparable harm."

c. Property

Baughman also asserts that his due process rights were violated when his property was intentionally destroyed at the Powledge Unit. Specifically, on April 14, 2019, on 15 dorm, "intentionally confiscated and destroyed Plaintiff's Lebron James Special Edition Nike Air-Max tennis shoes, valued at approximately $250.00-$300.00 replacement value." *Id*. at pg. 30. Despite Baughman showing Defendant TDCJ paperwork showing that the shoes belonged to him, Defendant Clakley "took the shoes, tied the shoe-string together, threw them over her shoulder

and headed to the Administrative Offices and Warden's Office with the shoes and the property papers. *Id*.

Baughman's mother called the Warden's Office "about the wrongful confiscation of Plaintiff's property." Baughman explains that 15 minutes later, Defendant Clakley returned the tennis shoes to Baughman by throwing them at him in his cell while also yelling profanities. Upon inspection of the shoes, Baughman asserts, he noticed "Defendant had taken a sharp round instrument and punctured the air-bag-inner soles and supports of each shoe," thereby "destroying the air-[cushioned] support in each shoe and rendering them useless." *Id*. at pg. 30. Defendant Bowman had the authority to compensate him for the property, but "failed and refused to address the destruction of the property in the grievance response nor did TDCJ in its Step 2 response." *Id*.

## II. *Martinez* Report

Pursuant to an order of the Court, the Office of the Attorney General of Texas filed a report, (Dkt. #52) (sealed), addressing Baughman's medical claims in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) (citing with approval in *Parker v. Carpenter*, 978 F.2d 190, 191-92 (5th Cir. 1992)). The Report includes Baughman's relevant medical records and submitted grievances. The Report also includes a detailed, fourteen-page affidavit from Dr. Glenda M. Adams, MD., M.P.H., who summarized Baughman's complaint, summarized her medical findings, and meticulously outlined Baughman's detailed medical care while housed at the Powledge Unit from February 2019 through March 2020.

The Court has conducted an independent review of Baughman's medical records and contained in the *Martinez* Report. The Court has determined that the Report accurately summarizes the contents of Baughman's medical records, treatment, and grievances.  Baughman responded to the *Martinez* Report, (Dkt. #57) and has not challenged the accuracy of his medical records.

7

### III. Baughman's Medical Records

Baughman maintains that Defendants Poe, Reeves, Ellis, Ballard, Bowman, and Mitchell acted with deliberate indifference to his serious medical needs, his cellulitis, "through denial of access to medical providers and/or through refusal to diagnose and treat Plaintiff." *Id*. at pg. 17. As explained below, however, Baughman's allegations are refuted by his medical records.

#### a. March 2019 Medical Visits and Appointments

On March 1, 2019, Baughman presented at the Powledge Unit's medical clinic as a result of submitting a sick-call request concerning his cellulitis. In his request, Baughman noted that he was a diabetic and that his feet as well as lower legs were swelling and red, (Dkt. #15, pg. id. #1289). After sitting for a few hours, his feet and legs begin to "balloon" and turn red and feverish' when he lays down, the "edema reduces, but is still present with redness and fever in lower legs." *Id*.

LVN Walton examined Baughman at this March 1, 2019, visit. Walton remarked that Baughman's pain was a zero. Baughman explained to Walton that for the past month, he had been "having intermittent swelling to bilateral lower legs," that "at times, his legs are red and warm to the touch," and that "after elevating his legs, the edema reduces." *Id*. at pg. id. #1299. Walton remarked that he had "+1 pitting edema to bilateral lower legs," but that "no redness or warmth noted." *Id*.

Walton explained to Baughman that he should "elevate extremity above [his] heart as much as possible" and to limit his physical activity. Furthermore, she consulted with Nurse Shofner and explained that Baughman will be scheduled to see a provider—a physician, physician assistant, or nurse practitioner—on the first available appointment and noted, under "disposition," "refer to the provider for "ATC #9—INTERMITTENT SWELLING TO BILATERAL LOWER LEGS." *Id*.

On March 11, 2019, Baughman arrived at the Powledge Unit's medical department as a "walk-in" appointment." *Id*. at pg. id. #549. Baughman complained about cellulitis to his legs, articulating that his "legs are swollen big, I haven't taken my Lasik for days because I need a catheter insert in my bladder. The condom catheter doesn't work or it won't stay on also I need some wipes to clean my inner thigh area." *Id*. Nurse Shofner examined him and noted that he had "+3 edema" but did not show any redness or heat of his lower extremities.

Nurse Practitioner Oyolu was contacted, who advised that "catheters are not given for convenience must be a medical necessity" and instructed Baughman to take his Lasik medication as ordered. She also issued him a medical pass for a urinal for 365 days and advised that he may use "soap and water to keep skin clean." *Id*. at pg. id. #550.

Baughman's medical records reveal that he missed his March 13, 2019, scheduled clinic appointment. Specifically, the medical report illustrates that Baughman was a "no-show" for his appointment for "ATC-9 c/o intermittent swelling to BBL," and that medical staff were not going to reschedule his appointment. *Id*. at pg. id. #551.

The next day, March 14, 2019, Nurse Oyolu examined Baughman at the Powledge Unit after submitting a sick-call request concerning his cellulitis. He was ambulatory to the medical clinic. Baughman reported that his cellulitis on his lower legs "usually starts after episode of UTI" and requested lotion for his legs, (Dkt. #52, pg. id. #553). On examination, Baughman's bilateral lower extremities showed +1 edema and "chronic discoloration," but no lesions, open wounds, warmth, or redness. *Id*. Nurse Oyolu ordered Baughman 1) an antibiotic (Minocycline) for ten days, 2) lotion for his legs, and 3) compression stockings. *Id*. at pg. id. #554. She also instructed him to elevate his legs, monitor his legs for warmth, redness or lesion—and to submit a sick-call request as needed.

b. September 2019 Medical Visits and Appointments

Baughman failed to arrive to his blood test on September 2, 2019, prompting medical staff to document the missed appointment, (Dkt. #52, pg. id. #1051). Nurse Vaughn documented that Baughman has missed "several FBS [finger stick blood sugar test) in a row. Refused medical and pm insulin. Stated no[w] eating in chow hall so he will not come to medical for insulin." *Id*. at pg. id. #1051. Medical staff nonetheless referred him to a provider.

The medical records reflect that Baughman missed his morning insulin injection on September 14, 2019, at the Powledge Unit. *Id*. at pg. id. #555. The Diabetic Flow Sheet shows that Baughman was a "no show" at 0400 hours. *Id*. He received his evening insulin injection, and his fingerstick blood sugar was recorded at 113 mg/dL. *Id*. The record shows that Nurse Gregory Howerton administered his evening insulin injection. *Id*. at pg. id. #556. While Baughman maintained that he told Defendant Ballard that evening at the insulin clinic that he had again developed cellulitis—showing her his legs and feet that were red, feverish, and blistered—the medical records are devoid of documentation confirming these facts.

Nonetheless, the records demonstrate that Baughman submitted a sick-call request on September 19, 2019, five days later, concerning his cellulitis. The Medical Department at the Powledge Unit received the request on September 20, (Dkt. #52, pg. id. #557). In his request, Baughman explained that his "cellulitis is back again! My feet and lower legs have been swollen for about 3-4 days now and despite taking Furosemide 40 mg bid the swelling has not gone down." *Id*. He also advised that he was "working under court deadlines and have law library from 12:30-16:30 every day. Thus, if provider makes an appointment I can't sit in medical all day I need in an out." *Id*.

Nurse Fitzgerald documented that Baughman was a "no-show" for his scheduled sick-call appointment for September 23, 2019. *Id*. at pg. id. #558. Baughman asserted that Defendant Ellis refused to let him "off the dorm" to go to his medical appointment, as Defendant Ballard "told Defendant Ellis that she was not running a 'nurses sick-call' and to not allow" him access to medical, (Dkt. #13, pg. 19). Despite missing this appointment, Baughman attended both his morning and evening insulin clinics on September 23, 2019—administered by Nurses Snell and Shofner, (Dkt. #52, pg. id. #559).

The next day, September 24, 2019, Baughman arrived at the Powledge Unit's Medical Department as a walk-in. He arrived in his wheelchair and was examined by Nurse Walton. *Id*. at pg. id. #566. Baughman complained about redness and swelling to his bilateral lower legs for one week and stated that he is typically treated with antibiotics for this issue in the past. *Id*. at pg. id. #563. He also explained that his pain was intermittent and at a five on a scale of ten. *Id*. An examination revealed redness and swelling—but no heat or stiffness. *Id*. Nurse Walton consulted Provider Oyolu, who ordered ten days of the antibiotic Minocycline. *Id*. at pg. id. #565. Baughman was then released to security.

### c. February 2020 Medical Appointments and Visits

On February 17, 2020, Baughman submitted a sick-call request to the Medical Department at the Powledge Unit. *Id*. at pg. id. #567. He explained that, "once again [he] developed cellulitis in [his] legs and left feet and need antibiotics. It happens every time [he] get[s] a kidney infection or UTI! About 2-3 weeks later cellulitis strikes." *Id*.

The medical records note that two days later, on February 19, 2020, Baughman was examined by medical staff. *Id*. at pg. id. #568. After an examination revealing redness, nursing staff received a verbal order for Baughman to receive the antibiotic Minocycline for ten days. *Id*.

at pg. id. #573. Medical staff performed an annual physical examination of Baughman the next day—finding only +3 peripheral edema to his lower extremities. *Id*. at pg. id. #576.

### d. March 2020 Medical Appointments and Visits

On March 3, 2020, Baughman submitted a sick-call request to the Powledge Unit's Medical Department. *Id*. at pg. id. #583. He stated that he has chronic cellulitis that is resistant to his last antibiotic Minocycline. He explained that he last took this antibiotic "for 11 ½ days and left leg still inflamed" and specifically asked for a different antibiotic. *Id*.

Baughman arrived at the Medical Department the next day, March 4, 2020, and was examined by Nurse Howerton. Nurse Howerton consulted a provider, who ordered Baughman to be treated with Amoxicillin antibiotic and Bactrim DS for ten days. *Id*. at pg. id. #588. He was stable upon discharge and advised to resubmit a sick-call request or notify the nurse if symptoms did not improve.

Subsequently, on March 24, 2020, Baughman presented to the Medical Department and is examined on an urgent basis. He complained of pain and swelling to his lower left leg, with symptoms persisting for over a month. *Id*. at pg. id. #595. Baughman further stated that he had been previously treated for his cellulitis with antibiotics on the same leg. Upon examination, staff reported that he was alert and that his lungs were clear. Baughman did not exhibit signs of distress, but did show +2 pitting edema to his lower left leg as well as a swollen left calf that was hard and tender to the touch. *Id*.

A provider was contacted, who ordered Baughman to be transported to a local emergency room because he was not responding to the antibiotics and had a history of deep vein thrombosis. *Id*. Prison staff transported Baughman to the Palestine Regional Medical Center within hours. The hospital records show that he exhibited "moderate swelling and tenderness to the left calf" with

12

"no erythema" (redness). *Id*. at pg. id. #607. Baughman underwent a duplex ultrasound of his left lower extremity deep venous system—with a finding of "no evidence of thrombosis" (blood clot). He was discharged from the hospital with a "peripheral edema" diagnosis.

## IV. Baughman's Relevant Medical Grievances

Two of Baughman's prison grievances, numbers 2020012581 and 2020011334, are relevant to these claims. The first concerns Baughman's allegation that prison staff would not let him attend medical on September 19, 2019, and the second concerns September 23, 2019. Both grievances provide context.

### a. Grievance Number 202012581

In this Step 1 grievance, submitted on September 25, 2019, Baughman explained that RN Ballard of the Powledge Unit acted with deliberate indifference by refusing to examine and treat him "as a walk-in" sick-call on September 19, 2019, (Dkt. #52, pg. id. #1035). He stated that he reported that his cellulitis returned to his feet and legs—further presenting his feet and legs that were swollen, inflamed, feverish, and showed blisters. Baughman noted that in refusing to treat him at 3:30 am on September 19, 2019, Ballard told him to "send in an I-60 to medical." He highlights how prison staff processed his I-60 on September 20, 2019, and issued him a lay-in pass for September 23, 2019, to see medical.

Baughman further highlighted that Officer Ellis called medical on September 23, 2019, at 2000 hours, and "was told" that they were not running nurses sick-call.    The following day, September 24, 2019, Ballard "admitted they were not running NSC at 2000 hrs as they were supposed to and told Baughman to submit another I-60 to be seen and again refused examination and treatment." *Id*. at pg. id. #1035. Thus, Baughman argues, Ballard acted with deliberate

indifference to his serious medical needs. On November 5, 2019, Defendant Sizemore, Practice Manager, responded to this Step 1 grievance as follows:

> Review of your records and per statements provided by the nursing, you were a no show for a 9/23/19 nursing appointment. On 9/24/19 you came in for diabetic clinic demanding to be seen for your leg complaint. You were advised to either wait in the holding tank or fill out another I-60. You were removed from medical by security staff for creating a disturbance. However, nursing note documents you were seen on that day at 17:42 for complaint of redness and swelling to bilateral lower legs. This grievance is denied.

*Id*. at pg. id. #1036.

Baughman filed his Step 2 grievance appeal on November 7, 2019. He stated that Defendant Sizemore was misinformed by Defendant Ballard, explaining that Defendant Ballard informed Defendant Ellis that there were no sick calls on September 23 and he was not permitted to go to medical. He insisted that he was not a "no-show," but rather was "not allowed to access medical." On November 20, 2019, prison officials responded as follows:

> A review of the medical grievance and documentation has been completed regarding your medical complaint for nurses to provide emergent care. According to medical documentation, you submitted a Nurses Sick Call Request on 9/20/2019, which was scheduled on 9/23/2019. You no showed to that appointment. You came to the Diabetic Clinic at 3:00 am on 9/24/2019 and demanded to be seen for cellulitis in your legs. You were instructed to remain in the cage until the provider arrived or re-submit a sick call request according to the nurses' statement. You were called out later that day on 9/24/2019 according to medical documentation, your legs were evaluated by the nurses, the provider was notified, and antibiotics were prescribed. You have received this antibiotic starting on 9/24/2019 and KOP on 9/27/2019.

> Documentation in the medical record indicates you have been afforded the access to proper medical care. An appellate review of this grievance and documentation, including staff statements and schedules, indicates there is no evidence to support or discredit your complaints at this time. Furthermore, your request for compensatory and punitive or money damage is not available through the grievance process.

Dkt. #52, pg. id. #1034.

b. Grievance Number 2020011334

Baughman submitted this Step 1 grievance on September 23, 2019, (Dkt. #52, pg. id. #1025). He explained that at 8:00 pm on September 23, 2019, he had a "lay-in" for a nurses-sick call and that Defendant Ellis was the security guard working 1 Block. *Id*. When he presented the lay-in to Defendant Ellis, "she refused to allow me off the cell block and said she would call medical." Baughman noted that he witnessed her pick up the phone "and a moment later, she said 'they are not doing Nurse's Sick Call now' and refused to allow me to go to the infirmary." *Id*.

He further explained that he is diabetic and insulin dependent. He also stated that he had a reoccurring infection (cellulitis) in his legs and feet, requiring treatment with antibiotics. Baughman asserted that his legs and feet have been inflamed for 8-9 days and that he put in a sick-call request to see the provider on September 19, 2019. According to Baughman, Defendant Ellis and the "officer working medical" denied him access to medical personnel when he had a "lay-in," thereby constituting deliberate indifference. As for his request "to resolve [his] complaint," Baughman stated that he "should be immediately seen and given treatment." Id. at pg. id. #1025. On October 15, 2019, Defendant Bowman responded as follows:

> Your grievance was investigated. Officer Ellis denies your allegations and contends at no time has he ever refused you or any other offender to go to their lay-ins. Furthermore Officer Ellis reports that when you showed him your pass that he contacted medical at which time he was told that they had not called for sick calls. Medical staff will reschedule the appointment as necessary. Your appointment was rescheduled 9/24/19 at which time you were seen. No further action is warranted.

*Id*.

Baughman filed a Step Two appeal on October 15, 2019. He explained that this incident was the second time he had cellulitis and staff denied him access to the Medical Department, as he was "denied access" on March 13, 2019. *Id*. at pg. id. #1022. Baughman insisted that he was

not seen on September 24, 2019 for his appointment, but was seen as an emergency. Finally, on February 9, 2020, after an investigation, prison staff responded as follows:

> Your Step 2 grievance has been investigated by this office. Your allegations that you were inappropriately refused your medical appointment by Officer Ellis could not be sustained. You were appropriately advised at the Step 1 level. Staff conduct will continue to be monitored to ensure policy compliance. Based on the information available at this time, no further action is warranted.

*Id*. at pg. id. #1023.

Crucially, records of the prison investigation of Baughman's complaint shows that Defendant Ellis explained that when "offender Baughman showed his lay-in to me, I call medical and they told me he needs to wait until they call for sick call." *Id*. at pg. id. #1029.

**V. Legal Standards**

Under 28 U.S.C. § 1915A, a court shall review any complaint in a civil action wherein a prisoner seeks redress from a governmental entity or officer, or employee of a governmental entity. During its review, the court must identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

A complaint is frivolous if it lacks an arguable basis in law or fact. *Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009). The Fifth Circuit has held that a complaint lacks an arguable basis in fact when "the facts alleged are fantastic or delusional scenarios or the legal theory upon which a complaint relies is indisputably meritless." *Id*. (quoting *Harris v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999) (internal quotation marks omitted)). In other words, during the initial screening under section 1915A, a court may determine that a prisoner's complaint is frivolous if it rests upon delusional scenarios or baseless facts—and dismiss the complaint. *See Henry v. Kerr Cnty., Tex.*, 2016 WL 2344231 *3 (W.D. Tex. May 2, 2016) ("A court may dismiss a claim as factually

frivolous only if the facts alleged are clearly baseless, fanciful, fantastic, delusional, or otherwise rise to the level of the irrational or the wholly incredible, regardless of whether there are judicially noticeable facts available to contradict them.") (citing *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)).

Moreover, a complaint fails to state a claim upon which relief may be granted where it does not allege sufficient facts which, taken as true, state a claim which is plausible on its face and thus does not raise a right to relief above the speculative level. *See Montoya v, FedEx Ground Packaging Sys. Inc.*, 614 F.3d 145, 149 (5th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim has factual plausibility when the pleaded factual content allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged. *See Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard is **not** akin to a probability standard; rather, the plausibility standard requires *more than the mere possibility* that the defendant has acted unlawfully. *Twombly*, 550 U.S. at 556 (emphasis supplied).

Although all well-pleaded facts are taken as true, the district court need not accept true conclusory allegations, unwarranted factual inferences, or legal conclusions. *See Whatley v. Coffin*, 496 F. App'x 414, (5th Cir. 2012) (unpublished) (citing *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Crucially, while the federal pleading rules do not require "detailed factual allegations," the rule does "demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading offering "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice, nor does a complaint which provides only naked assertions that are devoid of further factual enhancement. *Id.*

Furthermore, the Fifth Circuit has repeatedly upheld the District Court's use of a *Martinez* Report in which to develop the known facts of a case until it is satisfied that either the claims have merit or they do not:

> Due to the potential abuses by prisoners proceeding *in forma pauperis*, this circuit has given district courts broad discretion in making the determination of whether an *in forma pauperis* complaint is frivolous. As we have noted before, it is not always easy to determine whether a claim is frivolous simply by examining a complaint written by a prisoner unfamiliar with the rules of our courts. Prisoner complaints, more often than not, are difficult to decipher. However, this court has insisted that when it is not apparent from the fact of the complaint whether the prisoner's contentions are frivolous or not, the district court should make an effort to develop the known facts until satisfied that either the claims have merit or they do not. We have suggested that this may be done in a number of ways.

*Parker v. Carpenter*, 978 F.2d 190, 191 (5th Cir. 1992) (citing *Cay v. Estelle*, 789 F.2d 318, 325 (5th Cir. 1986) (internal citations omitted)). The Fifth Circuit has explained that ordering prison officials to investigate the facts surrounding a prisoner's complaint enables the district court to determine frivolity. *See Cay*, 789 F.3d at 193, n.2 ("In addition, this circuit cited with approval the procedure developed by the Tenth Circuit: ordering the prison officials to investigate the facts surrounding a civil rights suit by inmates to construct 'an administrative record … to enable the trial court to … make a determination [of frivolity]….'") (citing *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978)). The Fifth Circuit, in *Cay*, explained that "[e]xpansion of the record protects the unskilled litigant and enables the court to make an informed decision regarding the merits of an action by reference to the reality of the situation rather than by speculating as to the nature of the claim." *Id*. at 324 (citing *Anderson v. Coughlin*, 700 F.2d 37, 41 (2nd Cir. 1983)).

The Fifth Circuit has continually upheld a district court's reliance on a *Martinez* Report in a prisoner civil rights lawsuit alleging deliberate indifference to serious medical needs. *See Bailey v. Vincent*, 694 F. App'x 283, 284 (5th Cir. 2017) (Mem.) (unpublished) ("Second, although the State raised affirmative defenses in its *Martinez* report, Bailey has shown no error in the district

court's reliance on the report, which was otherwise proper under the circumstances.") (citing *Parker*, 978 F.2d at 191 n.2).

This is especially true when there is extensive medical records and the Plaintiff's pleadings show his disagreement with treatment provided. *See, e.g.*, *Tijerina v. Stanley*, 804 F. App'x 277, 278 (5th Cir. 2020) (Mem) (unpublished) (affirming finding of frivolity based on *Martinez* Report, finding that "Tijerina's argument that he provided evidence to support his claims, without more, fails to show a nonfrivolous issue challenging the district court's decision that his voluminous medical records established that he received treatment and that he simply disagreed with that treatment."); *Bakre v. Kendall*, 20-40660, 2022 WL 1165649, at *1 (5th Cir. Apr. 20, 2022) (affirming finding of frivolity based on *Martinez* Report, finding that "Bakre received extensive treatment but disagreed with particular aspects of that treatment. Thus, the district court correctly concluded that Bakre failed to meet the extremely difficult standard for showing deliberate indifference to serious medical needs.").

## VI. Discussion and Analysis

A liberal review of Baughman's amended complaint shows that he is raising claims concerning medical deliberate indifference to his serious medical needs.  Specifically, he contends that Defendants acted with deliberate indifference by denying him access to the medical department when he presented his lay-in pass on March 13, 2019, and September 23, 2019.

However, accepting Baughman's claims as true, all of his claims fail to state a claim upon which relief may be granted. Baughman's claims—and his voluminous medical records—show nothing more than his disagreement with the extensive and continuous treatment provided to him by the Defendants. Simply stated, while Baughman states that he was "refused" and denied access,

the undisputed medical records demonstrate that medical staff evaluated and treated Baughman the very next day after his missed appointments—on both instances.

Moreover, he pleaded no facts indicating or suggesting that the named Defendants knew of a substantial risk of harm when he presented to the medical clinic on those two occasions. He further wholly failed to plead substantial harm from delays of less than twenty-four hours. Baughman's complaints about his medical treatment boil down to his desire to dictate to prison officials *when* he is evaluated and treated. Such does not state a claim for deliberate indifference.

### 1. Deliberate Indifference to Serious Medical Needs

Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under section 1983. *See Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). In *Farmer*, 511 U.S. 835 (1994), the Supreme Court noted that deliberate indifference involves more than mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*. at 837.

The Fifth Circuit has discussed the high standard involved in demonstrating deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). In the medical care context, "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does an inmate's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Moreover, "medical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41F.3d 232, 235 (5th Cir. 1995) (affirming the district court's summary dismissal of Banuelos's lawsuit based on his medical records rebutting his claim of medical deliberate indifference).

Additionally, the Fifth Circuit issued a published opinion, affirming this Court's granting of summary judgment in a separate case in favor of defendants within regard to a plaintiff's claim of medical deliberate indifference. *See Petzold v. Rostollan*, 946 F.3d 242 (5th Cir. 2019). Petzold, a diabetic federal prisoner, injured his ankle while exercising. *Id.* at 245. The Fifth Circuit outlined the pertinent facts as follows, with footnotes to citations omitted:

> One Friday in October 2013, Petzold injured his ankle. He quickly iced it, but it swelled, and the pain became "excruciating." On his walk to the daily insulin-dispensing line, Petzold told a correctional officer about his injury. Petzold also claims that Mike Rostollan, a prison nurse, passed Petzold in the hallway and commented on his limp.
>
> Petzold waited in line for insulin. When it was his turn, he asked Rostollan, the dispensing nurse, to evaluate his ankle and render aid after the insulin line concluded. Rostollan, without looking at Petzold's ankle, told Petzold to "purchase some" pain medication—though the commissary was closed for the weekend—or "find some [pain medicine] on the unit," and "put some ice on it."

*Id.* at 246. A few days later, Petzold was treated by another nurse, with X-rays showing that his ankle was slightly fractured. *Id.* at 247. Petzold then filed a complaint alleging that Defendant Rostollan acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

After explaining that the deliberate indifference standard is extremely high, the Fifth Circuit found that Defendant Rostollan's actions and statements did not constitute deliberate indifference. Specifically, the Court stated reasoned:

> As a matter of law, Rostollan's instruction for Petzold to ice his ankle was medical treatment. It was medical treatment because it was medical advice that Petzold could, and did, effectuate. Petzold argues that the prescribed "treatment" was not based on an evaluation, lacked specific instructions, and was ineffective. But, because medical treatment was provided, even if it was negligent, disagreed-with, and based on a perfunctory and inadequate evaluation, it was not denied. Under governing precedent, imperfect treatment does not equal denied treatment. And a disagreement with recommended treatment is generally insufficient to show deliberate indifference.

*Petzold*, 946 F.3d at 250-51.

Here, Baughman's voluminous and detailed medical records during the time period about which he complains confirm Dr. Adams's summary: He received extensive medical treatment from medical personnel at the Powledge Unit—including the named Defendants—and simply disagrees or is unhappy with *when* he was treated. The record, however, does not indicate or show that Defendants refused to treat him, ignored his complaints, intentionally mistreated him, or evinced a wanton disregard for his medical needs. *See McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) ("Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind.").

It is well-settled that mere disagreement with a course of treatment or dissatisfaction with medical treatment does not constitute deliberate indifference under the Eighth Amendment. *See Gobert*, 463 F.3d at 346; *see also Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016) ("Blank's desire to see Dr. Sandknop more often amounts to a disagreement over his treatment, which, as discussed *supra*, does not rise to the level of deliberate indifference."). A delay in medical care or treatment can only constitute an Eighth Amendment violation if there has been deliberate

indifference that *results in substantial harm. See Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013).

In *Easter v. Powell*, a prisoner with a history of serious heart problems arrived at the prison infirmary for chest pain and vomiting two days after receiving his prescription for oxygen and nitroglycerin that is used to "prevent chest pains by relaxing blood vessels to the heart." 467 F.3d 459, 461 (5th Cir. 2006). The label on his nitroglycerin bottle included specific instructions to "dissolve 1 tablet under [his] tongue every 5 minutes as-needed for chest pain; after 3 tablets or 15 minutes call doctor if no relief has been obtained." *Id*. Approximately fifteen minutes later after arriving at the infirmary, Easter's chest pain ended, and he returned to his cell.

Two days later, Easter arrived back at the infirmary once again complaining about severe chest pain. He explained to Nurse Powell at the infirmary that "he has been experiencing severe chest pains for approximately twenty minutes." *Id*. Powell then took his blood pressure and sent him to the prison pharmacy to have his nitroglycerin prescription refilled. However, the prison pharmacy was closed—at which point Easter returned to the infirmary and "repeated his request that Powell provide him with nitroglycerin." *Id*. Powell accused Easter of being argumentative and told him that his blood pressure was normal—ordering him to return to his cell. Easter reminded Powell that he was at the infirmary for chest pain, rather than for his blood pressure, and further requested an electrocardiogram and nitroglycerin. Powell refused his request and security escorted him to his cell; after four hours of severe pain, Easter returned to the infirmary and was given nitroglycerin by a different medical professional. By the time his pain ceased, Easter explained, blood vessels in his left eye had burst causing it to fill with blood. *Id*.

The Fifth Circuit reversed the district court's granting Powell qualified immunity, holding that accepting Easter's claims as true, "Powell was aware of a serious risk to Easter's health, yet

turned deaf ear to his request for medical treatment." *Id*. at 464. The court further determined that Easter was not merely alleging a "disagreement about the nature of the treatment provided," as Powell failed to follow a prescribed course of treatment, "refused to provide any treatment to, and ignored the complaints of, a patient suffering chest pain that she knew had a history of cardiac problems." *Id*. Easter explained that he suffered severe pain and ultimately the bursting of his blood vessels in his eye from the delay in receiving his nitroglycerin. *Id*. at 464-65.

Similarly, the Fifth Circuit found that a defendant's "failure to call an ambulance for almost two hours while the plaintiff lay unconscious and vomiting rises to the level of deliberate indifference." *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003). In a more recent case involving a pretrial detainee, the Fifth Circuit synthesized its previous holdings in this context as follows: "law enforcement [and/or prison officials] may not ignore reports that a detainee is suffering a serious medical emergency, particularly when those reports are backed up by knowledge of a preexisting condition or trauma." *Williams v. City of Yazoo, Miss.*, 41 F.4th 416, 427 (5th Cir. 2022); *Galvan v. Calhoun Cnty.*, 719 F. App'x 372, 376 (5th Cir. 2018) (unpublished) (determining that a three-day delay in receiving treatment—during which Galvan reported experiencing "excruciating pain"—and was ultimately diagnosed with a urinary tract infection was deliberate indifference).

Here, accepting as true that Baughman was denied access to the medical department on March 13, 2019 and September 23, 2019, the undisputed medical records illustrate that he was seen, evaluated, and treated for his cellulitis the next day—mere hours later. He pleaded no facts indicating that the Defendants acted with deliberate indifference through a delay in treatment. In other words, Baughman pleaded no facts indicating that Defendants knew of a substantial risk of harm from his cellulitis on March 13, 2019, and September 23, 2019, and then disregarded it.

With respect to the first instance, March 13, 2019, Baughman alleges that Defendant Poe, the officer working the dorm, would not let him access medical despite him showing Poe his "lay-in pass." Defendant Reeves told Poe that there was no more room. But Baughman does not allege that these Defendants knew of a substantial risk of harm concerning his cellulitis, as Poe merely called Defendant Reeves who allegedly informed her that there was no room. *See Hinton v. Harris Cnty.*, 2022 WL 2752805, at *2 (5th Cir. July 14, 2022) ("That is not enough to establish deliberate indifference. As the district court noted, the plaintiff cannot point to any evidence that shows Morehouse was *subjectively aware* of a substantial risk that harm would befall Hinton.").  It is well-settled that the failure to alleviate a significant risk that a prison should have perceived, but did not, is insufficient to demonstrate deliberate indifference. *Domino*, 239 F.3d at 756.

At most, Baughman has pleaded only that Poe and Reeves knew he had "lay-in pass" for the medical department on March 13, 2019. In this way, he has pleaded no facts pleading that Poe or Reeves knew of a substantial risk of harm to Baughman's health if he was not seen for his cellulitis appointment on March 13, 2019. *See, e.g., Williams*, 41 F.4th at 425 ("They also knew that Williams had a life-threatening condition and had suffered trauma of the past that would trigger that condition."); *Easter*, 467 F.3d at 463 ("...and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.").

Baughman pleaded no facts indicating substantial harm from these brief delays. While severe pain suffered during a delay in treatment can constitute substantial harm, Baughman does not describe excruciating, debilitating, or severe pain as in *Easter* or *Galvan*. Specifically, the medical records demonstrate that Baughman had a scheduled medical appointment for March 13,

25

2019. Baughman did not make this scheduled appointment on March 13, 2019; however, the medical records illustrate that he was examined by Nurse Oyolu the next day—March 14, 2019—for his cellulitis complaints at the Powledge Unit. *See* Dkt. #52, pg. id. #553.

During this examination, Baughman explained that his cellulitis acts up after a urinary tract infection and requested lotion. Nurse Oyalu completed an examination—which revealed bilateral lower extremities +1 edema and "chronic discoloration," but no lesions, open wounds, warmth, or redness. Nurse Oyolu ordered Baughman 1) an antibiotic (Minocycline) for ten days, 2) lotion for his legs, and 3) compression stockings. *Id*. at pg. id. #554. She also instructed him to elevate his legs, monitor his legs for warmth, redness or lesion—and to submit a sick-call request as needed.

Accordingly, while Baughman may not have been evaluated on March 13, 2019, he was examined by a nurse on March 14, 2019, and prescribed medication and provided lotion and compression stocking for his cellulitis. Contrary to his contentions, Defendants did not refuse to treat him and did not ignore his complaints. Imperfect treatment does not equal denied treatment.

Importantly, Baughman neither alleges nor shows that he suffered substantial harm stemming from this brief delay—mere hours—in receiving medical treatment for his cellulitis. While he states that he suffered "pain" and "physical injury" as a result of Defendants Reeves and Poe's denial of access on one occasion, he does not elaborate whatsoever. Moreover, as the medical records show, when Baughman was examined hours after his missed appointment, the medical professional found edema and "chronic discoloration," but no lesions, open wounds, warmth, or redness. "Pain" and a conclusory assertion of "physical injury" coupled with no significant medical findings hours later cannot be characterized as "substantial harm."

In this way, Baughman has not connected the denial of access to medical on March 13, 2019—when he was subsequently treated and evaluated hours later—to a delay that resulted in

substantial harm. Stated differently, Baughman states no facts that would show Defendants Reeves and Poe wantonly, willfully, or intentionally refused to treat him or that they exposed him to a serious risk of harm because they failed to treat him on March 13, 2019. *See Cullum v. Tex. Dept. of Crim. Justice*, 2008 WL 4415155, at *5 (S.D. Tex. 2008).

Similarly, as to the second incident, Baughman pleaded no facts that would show that Defendant Ballard and Ellis wantonly, willfully, or intentionally refused to treat him or that they exposed him to a serious risk of substantial harm because they denied him access to the medical department on September 23, 2019, when he was treated hours later and pleaded no substantial harm.

The medical records show that Baughman submitted a sick-call request on September 19, 2019, concerning his cellulitis, and the medical department at the Powledge Unit received the request on September 20, (Dkt. #52, pg. id. #557). Baughman explained that his "cellulitis is back again! My feet and lower legs have been swollen for about 3-4 days now and despite taking Furosemide 40 mg bid the swelling has not gone down." *Id*. He also advised that he was "working under court deadlines and have law library from 12:30-16:30 every day. Thus, if provider makes an appointment I can't sit in medical all day I need in an out." *Id*. He was scheduled an appointment for September 23, 2019.

Baughman asserts that Defendant Ellis refused to let him "off the dorm" to go to his medical appointment on September 23, 2019, as Defendant Ballard "told Defendant Ellis that she was not running a 'nurses sick-call' and to not allow" him access to medical, (Dkt. #13, pg. 19). Despite missing this appointment, Baughman attended both his morning and evening insulin clinics on September 23, 2019. On September 24, 2019, Baughman was examined by Nurse Walton. *Id*. at pg. id. #566. It revealed redness and swelling—but no heat or stiffness. *Id*. Nurse

Walton consulted Provider Oyolu, who ordered ten days of the antibiotic Minocycline. *Id*. at pg. id. #565. Baughman was then released to security.

Once again, Baughman provides no facts indicating any Defendant acted with deliberate indifference to his cellulitis when he was evaluated and treated mere hours later. Baughman was not evaluated on the day of his scheduled appointment, but he was evaluated and treated with antibiotics—which was his specific request—mere hours later. Imperfect medical treatment does not equal denied treatment. Baughman, moreover, pleads no facts indicating Defendant Ellis was aware of a substantial risk of harm to him.

A review of Baughman's extensive medical records show that Baughman received a considerable quantum of medical care—plainly belying any claim of deliberate indifference. *See Gomez v. Hughes Unit UTMB Health Prov.*, 784 F. App'x 279, 279 (5th Cir. 2019) (unpublished) ("The record shows that Gomez had medical appointments with the defendants; one of the defendants prescribed medication for him. Additionally, there is nothing in the record to show that the defendants exhibited a wanton disregard for any serious medical needs.*"); Freeland v. Tarrant Cnty., Tex.*, 789 F. App'x 406, 409 (5th Cir. 2019) (unpublished) ("This course of medical treatment does not clearly evince wanton disregard for Freelance's serious medical needs. Freeland's alcohol-withdrawal symptoms were monitored and assessed, and he subsequently received medical attention, treatment, and medication.").

Here, the extensive medical records show active medical treatment, as Baughman continues to be treated for his diabetes at the Powledge Unit. *See* Dkt. #52, pg. id. #546; 641; 1237; 1241). Active medical treatment, even if negligent, does not constitute deliberate indifference. *See Diaz v. Mendoza*, 2009 WL 2588708. at *2 (S.D. Tex. Aug. 2009) ("As noted above, active treatment, even negligent treatment, cannot form the basis of a deliberate indifference claim.").

On these facts, Baughman's missing two medical appointments—when he was evaluated and treated hours later—fails to state a claim for deliberate indifference upon which relief may be granted. *Hunt v. Pierson*, 730 F. App'x 210, 214 (5th Cir. 2018) (unpublished) ("The official's conduct must be more than unreasonable, it must be 'intentional' and 'evince a wanton disregard' for the inmate's health and safety.").

Conversely, the medical records reveal Baughman's disagreement with when he is treated. The *Martinez* Report illustrates that, on at least one occasion, Baughman refused to attend a medical appointment because he was eating, (Dkt. #52, pg. id. #1051). He also wrote in a grievance that he cannot be scheduled for medical appointments while he is attending the law library. Importantly, Baughman wrote to prison officials that he "should be immediately seen and given treatment" whenever he presents for a medical issue. *Id.* at pg. id. #1025. Baughman does not refute these facts contained in the *Martinez* Report.

Baughman's articulated facts and complaints necessarily involve his desire to dictate to prison officials when he is treated for his medical problems. But mere disagreement with provided medical treatment does not constitute deliberate indifference. *See Trujillo v. Arce*, 109 F. App'x 668, 670 (5th Cir. 2004) (unpublished) ("Arce's decision to continue treating the pain with medication and monitoring Trujillo's progress rather than to refer him to a specialist shows only a difference of opinion as to the proper course of treatment," which does not demonstrate a constitutional violation); *Russell v. Ivans*, 2008 WL 4584776 *1 (5th Cir. 2008) (unpublished) ("Therefore, Russell's allegations are merely disagreements with the type of care that he was provided; Russell cannot state a § 1983 cause of action on this basis.").

The Fifth Circuit has held that a prisoner who had been examined by medical personnel on numerous occasions, as evident in this case, failed to set forth a valid showing of deliberate

indifference to serious medical needs. *Spears v. McCotter*, 766 F.2d at 181. *In Martinez v. Griffin*, 840 F.2d 315 (5th Cir. 1988), the Court noted that "[t]his case is one of an increasing number of examples of attempts by prisoners to use the courts as a general grievance procedure to complain about whatever matters having to do with their incarceration they do not like. … It is not for the federal courts to second-guess what is obviously careful diagnosis and adequate treatment just because a prisoner finds something to be unhappy about."

Here, these allegations are no different.  In a day when, unfortunately, many free citizens enjoy little or no access to healthcare, Baughman's complaints about missing two appointments, when he was evaluated and treated mere hours later and pleads no substantial harm, ring especially hallow. *See Baughman v. Seale*, 761 F. App'x 371, 381 (5th Cir. 2019) (unpublished) ("Negligence or medical malpractice do not suffice for a constitutional tort: Baughman must point us to facts upon which a jury could find defendants' 'wanton disregard' for his diabetic condition. He has failed to do so."). All of Baughman's claims of deliberate indifference to his medical needs should be dismissed, as he has merely shown that prison officials were—at most—negligent in failing to allow him access to the medical department for his two appointments.

## 2. Retaliation

Baughman further maintains that Defendants Poe and Stanhope retaliated against him through issuing a disciplinary case, case number 2020036036. Specifically, he argues that he received a disciplinary case—for being "out of place" in the chow hall—after he reported Defendant Poe's unsanitary handling of food to her supervisor(s). Baughman readily admits to going through both A-Line and B-Line of the chow hall; the A-Line, which Baughman entered first, served pork among beans and vegetables.

Because he desired the beef-chili-mac in addition to his beans and vegetables from A-Line, Baughman entered the B-Line but was refused food. He was charged with a disciplinary case a few days later as he "was in B2 Dining Hall, in B-Line after receiving his tray in A-line, when he in fact had no authorization to be in such place," found guilty, and assessed a punishment of the loss of fifteen days of commissary. Prison officials later overturned the disciplinary case, but only after Baughman lost his fifteen days of commissary privileges.

Ultimately, Baughman argues that Defendants Poe and Stanhope, by issuing him the disciplinary case, retaliated against him for exercising his First Amendment right to grieve the conditions of his confinement. *See Keenan v. Tajeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment not only directs limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities.") (quoting *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)).

Federal Courts view prisoners' retaliation claims "with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Woods v. Smith*, 60 F.3d 1161, 1164-66 (5th Cir. 1995). To prevail on a section 1983 claim for First Amendment retaliation, Baughman must show that "(1) [he] was engaged in a constitutionally protected activity[;] (2) the defendant's actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity[;] and (3) the defendant's adverse actions were substantially motivated [by] the constitutionally protected conduct." *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017) (citing *Keenan*, 290 F.3d at 259). The second element requires some showing that "the plaintiff's exercise of free speech has been curtailed." *Keenan*, 290 F.3d at 259.

The Fifth Circuit most recently found that in order for a prisoner to succeed on a retaliation claim, the prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. *See Streater v. Davis*, 2022 WL 10362714, at *1 (5th Cir. Oct. 18, 2022) (quoting *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)). To show causation, "an inmate must allege the violation of a constitutional right and be prepared to establish that but for the retaliatory motive the complained of incident … would not have occurred." *Ancar v. Robertson*, 2022 WL 1792535, at *3 (5th Cir. June 2, 2022) (quoting *Woods*, 60 F.3d at 1166).  In *Streater*, the Court determined that Streater failed to allege causation because, in part, "he failed to allege facts to allow the inference that he was transferred because of his lawsuit." *Id.*

Here, as pleaded, Baughman fails to allege facts to allow the inference that he received his disciplinary case because of his exercising his right to grieve the conditions of his confinement. In other words, Baughman failed to allege facts that would show that but for Defendants' retaliatory motive, he would not have received the disciplinary infraction he complains of. Baughman's articulation of the facts reveal that he readily admits to proceeding through the A-Line of the chow hall, acquiring beans and vegetables, before he entered the B-Line of the chow hall. Once in B-Line, he asked Defendant Poe for a serving of the beef-chili-mac since he cannot consume pork that was being served in A-Line. According to Baughman, Poe refused—and once he complained to a prison employee about the refusal, Poe decided to "write him up for being out of place." A few days later, Captain Tanner demanded to know why Baughman was accusing Defendant Poe of doing drugs and mishandling food. Baughman received the disciplinary case for his being in an unauthorized place, which was ultimately overturned.

But Baughman cannot establish the "causation" element because he cannot show that "but for" any retaliation, he would <u>not</u> have received the disciplinary infraction.  An additional basis exists for finding Baughman guilty of this infraction: He readily admits to proceeding through both A-Line and B-Line of the chow hall. Because Baughman was inside an unauthorized place—i.e., B-Line when he already had a food tray after proceeding through A-Line—he cannot show that he would not have received the disciplinary case absent Defendant Poe's actions.

Baughman insists that he was not "out of place," because there are no TDCJ rules providing that he cannot do what he did. A review of the TDCJ Handbook, which all prisoners are given and have access to, provides that "an offender may go through the serving line once per meal," and that "[o]ffenders who are not satisfied with the food may talk to the correctional officer on duty." In totality, the TDCJ's rules concerning meals show that a prisoner is not permitted to eat twice.

Furthermore, the TDCJ Grievance Rules and Procedures Handbook defines "Out of Place" as "[i]n any unauthorized area, such as a cell or wing to which one is not assigned"; or (b) "[f]ailure to be at a designated area at a specified time, for example, the offender has a lay-in for a medical appointment but goes to the law library instead." Baughman's own articulation of the facts demonstrate that he did not comply with TDCJ rules—as he entered attempted to get food twice, from two different lines—and thus he cannot demonstrate that he would not have received his disciplinary case for being in an unauthorized place but for Defendant Poe's alleged retaliation.

### 3. Property

Finally, Baughman asserts that Defendant Clakley, Bowman, and Collier violated his constitutional rights by destroying his Lebron James Special Edition Nike Air-Max sneakers. Baughman alleges Defendant Clakley took the shoes, tied the strings together, and punctured the airbag soles of the sneakers.

Otherwise known as the *Parratt/Hudson* doctrine, the random, unauthorized, and even negligent deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy. *See Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir. 1991) (emphasis added); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541-44 (1981). Before the doctrine can be applied, three pre-deprivation conditions must be met: (1) that the deprivation was predictable; (2) that the pre-deprivation process be impossible, making any additional safeguards useless; and (3) that the conduct of the state actor be unauthorized. When these conditions exist, the State cannot be required to do the impossible by providing a pre-deprivation process. *See Charbonnet v. Lee*, 951 F.2d 638, 642 (5th Cir. 1992); *Myers v. Klevenhagen*, 97 F.3d 91, 94-95 (5th Cir. 1996).

In other words, the deprivation of property by prison officials—even when negligent or intentional—does not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists. *Hudson*, 468 U.S. at 533; *see also Simmons v. Poppell*, 837 F.2d 1243, 1244 (5th Cir. 1988) ("The Due Process Clause is not implicated by a state officials negligent act causing unintended loss of property.").

The Texas state judicial system provides an adequate state post-deprivation remedy. *See* Tex. Gov. Code Ann. Art. 501.007 (Vernon Supp. 1994); *see also Murphy Collins*, 26 F.3d 541, 543-44 (5th Cir. 1994) ("In *Hudson v. Palmer*, the Supreme Court held that deprivation of property caused by the misconduct of state officials does not infringe constitutional due process provided adequate state post-deprivation remedies exist. In Texas, as in many other states, the tort of conversion fulfills this requirement.").

Here, if Baughman's Lebron James sneakers were purposely destroyed, then the deprivation of his property—whether the property was stolen, lost negligently, or broken—was

necessarily a random, unauthorized act and, therefore, not a due process violation. Baughman had a post-deprivation remedy in state court, and his claims are meritless under *Parratt*/*Hudson*. While he insists that the destruction of his sneakers "was not random or unauthorized under *Pratt*/*Hudson* doc[trine], where the TDCJ/State delegated to Defendant Clakley the power and authority to effect the very deprivation complained of," the Court notes that simply because a defendant may have had "delegated authority," such not mean that the destruction of the sneakers stemmed from an established state procedure. This claim should be dismissed.

### VII. Conclusion

A review of the pleadings and the *Martinez* Report, viewed in light most favorable to Baughman, reveals that he failed to state a claim upon which relief may be granted concerning his claims of (1) deliberate indifference to his serious medical needs, (2) retaliation through a disciplinary infraction, and (3) the destruction of his Lebron James sneakers.

The *Martinez* Report shows that Baughman has received a significant quantum of medical care for his cellulitis while housed at the Powledge Unit. While the record does confirm that Baughman missed two scheduled medical appointments for his cellulitis, the medical records show that he was seen, evaluated, and treated mere hours later on both occasions. Furthermore, Baughman has not pleaded facts indicating that these mere delays resulted in substantial harm or that the named Defendants knew, or had reason to know, of a risk of substantial harm.

Similarly, Baughman pleaded no facts indicating that but for any adverse action by the named Defendants, he would not have received a disciplinary infraction for his actions inside the chow hall. While Baughman certainly has the right to complain of the food served inside his prison, he readily admitted to going through both chow-hall lines. Because Texas has a post-deprivation remedy, the destruction of the soles of Baughman's sneakers presents no constitutional issue.

RECOMMENDATIONS

For these reasons, the undersigned recommends that Baughman's claims regarding deliberate indifference to his serious medical needs against Defendants Poe, Ellis, Reeves, Ballard, Bowman, and Mitchell be dismissed, with prejudice, for the failure to state a claim upon which relief may be granted. The undersigned further recommends that Baughman's retaliation claims against Defendants Poe and Stanhope be dismissed, with prejudice. Finally, Baughman's property claims against Defendants Clakley, Bowman, and Collier should also be dismissed, with prejudice, for the failure to state a claim upon which relief may be granted.

Baughman's ADA, heat, and excessive force claims remain pending before the Court. Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 2nd day of November, 2022.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

36